**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA, *ex rel.* VETERAN MARKETING LLC,** **Plaintiff,** | **CIVIL ACTION** |
| **v.** | **NO. 21-0853** |
| **RESPIRONICS, INC.,** **Defendants.** | |

**MEMORANDUM OPINION**

Plaintiff-Relator Veteran Marketing, LLC ("Veteran Marketing") brings this *qui tam* action alleging Defendant Philips RS North America LLC (f/k/a Respironics, Inc.) ("Respironics") violated three counts of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A)-(B), (G). Respironics moves to dismiss all counts pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). Defendant also challenges the constitutionality of the *qui tam* provisions of the FCA under the Appointments, Vesting, and Take Care Clauses of Article II of the U.S. Constitution. U.S. Const. art. II, §§ 1, 2, 3. For the reasons that follow, the Motion will be denied in part and granted in part.

## I. FACTUAL BACKGROUND

The following facts are drawn from Plaintiff's Amended Complaint and are accepted as true for the purpose of the Motion to Dismiss. *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997). This case concerns the allegedly fraudulent sale of respiratory products to the U.S. Department of Veteran Affairs (the "VA"), which purchases massive quantities of such products from Respironics in providing healthcare services to veterans and their families. According to Veteran Marketing, Respironics is engaged in a widespread scheme to sell to the

VA products, particularly masks used during sleep therapy and Continuous Positive Airway Pressure ("CPAP") machines, that are manufactured in China, in violation of the "Buy American" requirements applicable to federal procurement, and thus in violation of the FCA.

The FCA "imposes civil liability on anyone who 'knowingly presents . . . a false or fraudulent claim for payment or approval' to the United States Government." *United States ex rel. Charte v. Am. Tutor, Inc.*, 934 F.3d 346, 351 (3d Cir. 2019) (quoting 31 U.S.C. § 3729(a)(1)(A)). Under the FCA, private parties ("relators") "may bring a *qui tam* civil action for the [private party] and for the United States Government against the alleged false claimant, in the name of the Government." *Id.* (quotation marks omitted). The Government may choose to intervene, but if it does not—as it did not here—the relators have the right to conduct the action. *Id.*

Veteran Marketing alleges that, in its sales to the VA, Respironics violated the FCA by falsely certifying compliance with two statutes that generally obligate federal agencies to acquire products manufactured in the United States or through trade partners: the Buy American Act ("BAA"), 41 U.S.C. §§ 8301 *et seq*., and the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2501 *et seq*. The BAA requires federal agencies to purchase American-made products, providing that "[o]nly manufactured articles, materials, and supplies that have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured in the United States, shall be acquired for public use." 41 U.S.C. § 8302(a)(1). The TAA allows the Government to purchase materials from designated countries with which the United States has a reciprocal trade agreement, essentially providing an exception to the BAA's mandate. *See* 19 U.S.C. § 2512(a)(1). The Federal Acquisition Regulations ("FAR") for the TAA provide that "the Contractor shall deliver under this contract only U.S.-made or designated country end

products." 48 C.F.R. §52.225-5. The FAR defines "U.S.-made end product" as "an article that is mined, produced, or manufactured in the United States or that is substantially transformed in the United States into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed." 48 C.F.R. § 25.003.[1] China is not one of the TAA's designated countries.

The VA purchases large quantities of Respironics's respiratory products through an intermediary distributor, First Nation Group, LLC ("First Nation"). As a distributor, First Nation acts as a conduit for manufacturers like Respironics, purchasing its products and then re-selling them to the VA. Additionally, Respironics promotes its products directly to the agency. Its employees are regularly in the VA's offices touting products, and internal documentation indicates the VA is viewed as a profitable client. One document describes it as the company's "highest margin account." A July 2018 email from Respironics's Director of Sales, Paul Evans, further states that its "margins are higher at the VA . . . and the volumes can be tremendous . . . ." In a November 2018 email, Evans stated "VA's [sic] are the beef brisket (vs fast food) of our customers – takes time but well worth it."

The VA has awarded at least two Federal Supply Schedule ("FSS") contracts to First Nation: (1) Contract No. V797P-4297B in or about July 2010; and (2) Contract No. 36F79719D0027 in or about December 2018 (together the "FSS Contracts"). Both contracts cover a variety of products manufactured by Respironics, including masks and CPAP machines.

---

[1] This definition mirrors the TAA's definition of "a product of a country," which is:

> (i) it is wholly the growth, product, or manufacture of that country . . . , or (ii) in the case of an article which consists in whole or in part of materials from another country . . . , it has been substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed.

19 U.S.C. § 2518(4)(B).

Veteran Marketing alleges the solicitation document for Contract No. 36F79719D0027 required bidders to certify compliance with the "Buy American" requirements of the BAA. The vendor response form submitted by First Nation further stated that, in accordance with the TAA, "purchases . . . are restricted to either U.S.-made or designated country end products," and "[i]t is the offeror's responsibility to verify that all offered products are U.S. made or designated country end products as defined in clause FAR 52.225-5."

Despite this, Veteran Marketing maintains that it has firsthand knowledge that Respironics's masks are manufactured and almost entirely assembled in China. Specifically, it alleges that the masks are shipped from China in boxes, marked "Made in China," to Respironics's distribution facilities in the United States. At the distribution facilities, Respironics employees minimally assemble the masks by hand in approximately 10-15 seconds, without the use of machines or tools. Veteran Marketing equates the assembly to snapping a few Lego blocks together. The masks are then repackaged in different boxes, without a "Made in China" marking, and shipped to the VA. In addition, blowers that function as a core component of Respironics's CPAP machine are also manufactured in China. After importing the blowers, Respironics takes minimal steps to incorporate them into the finished CPAP machine.

The Amended Complaint includes email correspondence from 2018 regarding sales to the VA. On January 16, 2018, Evans emailed the sales team, writing "**WE CAN AND SHOULD SAMPLE AT THE VA**," but "[h]owever, we ask that you **DO NOT SEND SAMPLES *DIRECTLY* TO THE VA from your demo account**." Evans wrote "[w]ith concerns of packaging ('*Made in China'* etc.), there is a sensitivity level that we need to be careful with as we provide samples to the VA." Emphasis added. On January 31, 2018, Scott Mathson, a Government Specialist at Respironics, also sent an email to the sales team with the subject line

"Sampling in the VA reminder." In it, he wrote "[i]n regards to **sampling in your VA account we CAN and SHOULD BE as active and aggressive in sampling** as you are with all your accounts. However, DO NOT SHIP SAMPLES DIRECTLY TO THE VA . . . ." Mathson noted that "[s]hipping directly could raise sensitivity to some of the packaging on the masks (i.e. *'made in china'*)." Lastly, in an April 2018 email, Mathson again wrote "**[d]o not direct ship samples** but schedule time with the VA . . . ." Emphasis added.

Veteran Marketing alleges that Respironics's sales to the VA violate statutory and regulatory requirements under the TAA and the BAA, consequently violating the FCA.

## II. LEGAL STANDARDS

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

When analyzing a motion to dismiss, a complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id.* at 210-11.

With respect to claims premised on fraud, a plaintiff "must state with particularity the

circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* But "plaintiffs must still allege facts that show the court their basis for inferring that the defendants acted with 'scienter.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

## III. DISCUSSION

### A. False Claims Act

#### *i. False Claims Under 31 U.S.C. § 3729(a)(1)(A)-(B)*

The FCA imposes liability on someone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the Government or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). To prevail on an FCA claim, the relator must plausibly allege facts demonstrating: (1) the defendant presented a false claim for payment to the Government; (2) the defendant knew the claim was false; (3) the false claim was material to the Government's decision to pay the claim; and, (4) the false claim caused the Government to make payment. *See United States and New Jersey ex rel. Druding v. Care Alts.*, 81 F.4th 361, 366 (3d Cir. 2023). A FCA violation, in other words, "includes four elements: falsity, causation, knowledge, and materiality."[2] *United States ex rel. Petratos v. Genentech*

[2] While Respironics argues Veteran Marketing fails to plausibly allege falsity, causation, and knowledge under Rules of Federal Procedure 12(b)(6) and 9(b), it does not discuss materiality. That said, the Third Circuit "sometimes recounts these elements differently," without a materiality requirement. *United States ex rel. Allstate Ins. Co. v. Phx. Toxicology & Lab Servs., LLC*, 2024 WL 2785396, at *7 (D.N.J. May 30, 2024). *See, e.g.*, *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 175 (3d Cir. 2019) ("[R]elators must plead three elements: (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.") (quotation marks omitted). Regardless, Defendant has forfeited any argument that Veteran Marketing has not plausibly alleged materiality. *See* Loc. R. Civ. P. 7.1(c) ("Every motion. . . shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion."); *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017) ("[A]n example of [forfeiture] is an inadvertent failure to raise an argument."); *United States v. Heatherly*, 985 F.3d 254, 270 (3d Cir. 2021) (treating failure to "develop[ ] . . . arguments properly" as forfeiture).

*Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).

Rule 9's heightened pleading standard applies to FCA claims. *See United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 n.9 (3d Cir. 2004). Conducting that analysis is a balancing act. On the one hand, "Rule 9's heightened pleading standard protects defendants from easily lobbied but flimsily supported allegations of bad-faith conduct," while on the other hand, "holding plaintiffs to too high a pleading standard before discovery risks rewarding defendants who have concealed their fraud so successfully that plaintiffs with meritorious claims do not have enough information to get to discovery." *Russ v. N. Am. Rescue, LLC*, 2024 WL 3557441, at *3 (E.D. Pa. July 26, 2024) (Beetlestone, C.J.). *See Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) ("Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud.") (quotation marks omitted).

In practice, "Rule 9(b)'s particularity requirement requires a plaintiff to allege all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where, and how of the events at issue." *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019) (quotation marks omitted). Critically, though, a plaintiff need not "plead anything more, such as the date, time, place, or content of every single allegedly false [ ] claim." *Id.* "[I]t is sufficient for a plaintiff to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 157-58 (3d Cir. 2014) (quotation marks omitted). Doing so "place[s] the defendant on notice of the precise misconduct with which [it is] charged" and "inject[s] precision or some measure of substantiation into [the] fraud allegation." *Alpizar-Fallas v. Favero*, 908 F.3d 910,

919 (3d Cir. 2018).

a. Falsity

Beginning with falsity, "a false or fraudulent claim may be either factually false or legally false." *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 94 (3d Cir. 2018). A claim is factually false when "the claimant misrepresents what goods or services . . . it provided to the Government," and legally false when "the claimant knowingly falsely certifies that is has complied with a statute or regulation" when compliance is a condition of Government payment. *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011), *overruled on other grounds as recognized by United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh*, 728 F. App'x 101 (3d Cir. 2018). Veteran Marketing allegations are that Respironics submitted legally false claims to the Government.

A legally false certification can be express or implied. *See Chowns Grp., LLC v. John C. Grimberg, Co.*, 2024 WL 375824, at *4 (E.D. Pa. Jan. 30, 2024). An express legally false certification "occurs when a defendant makes a false affirmative statement that it has complied with a contract term, statute, or regulation." *Id.* (citing *Care Alts.*, 952 F.3d at 96). An implied legally false certification "occurs when a claimant fails to disclose that the goods or services provided do not comply with a statutory, regulatory, or contractual requirement." *Id.* (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 190-91 (2016)). Veteran Marketing has alleged the BAA and TAA, along with their corresponding regulatory provisions, are applicable to acquisitions by the VA, and that federal procurement in general includes requirements obligating federal agencies to acquire products manufactured in the United States. Its allegations suggest that Respironics submitted implied legally false certifications. Veteran Marketing further alleges that a contract under which the VA purchased Respironics's

respiratory products explicitly required verification of compliance with the TAA and the BAA,[3] and therefore that Respironics also submitted explicit legally false certifications.

Under any theory, "FCA falsity simply asks whether the claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government." *Care Alts.*, 952 F.3d at 97. Veteran Marketing alleges that Respironics, through the intermediary of First Nation, sells the VA massive quantities of its respiratory products—including CPAP machines and masks—under the FSS Contracts. Veteran Marketing quotes language from the solicitation document and vendor response form for Contract No. 36F79719D0027, requiring compliance with the BAA and the TAA. Despite this, Veteran Marketing alleges, Respironics's masks and CPAP machines are neither BAA- nor TAA-compliant. Its masks are manufactured and almost entirely assembled in China, then shipped in

[3] In its Motion to Dismiss, Respironics argues that Veteran Marketing fails to allege a BAA violation because the TAA and BAA cannot apply to a contract simultaneously, and because there are no allegations demonstrating either of the FSS Contracts required compliance with the BAA. In support of the latter argument, Respironics asserts that the language of the solicitation document quoted in the Amended Complaint requiring certification of BAA compliance was not at issue for that contract because the VA did not select the box indicating the BAA applied, attaching to its motion excerpts from the solicitation document as evidence. The Court will consider as true the allegations in the complaint regarding BAA compliance at this stage. While a document that is "integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks omitted), "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022). Facts in the attached solicitation document are contested by the well-pleaded facts alleged by Veteran Marketing in the Amended Complaint, and so, at this stage, the allegations in the complaint must prevail. *See id.* ("The proper place to resolve factual disputes is not on a motion to dismiss, but on a motion for summary judgment."). Further, despite Defendant's argument that only one statute can apply, Veteran Marketing's allegations concerning TAA compliance are inherently linked to its allegations concerning BAA compliance, as the two statutes are intertwined. *See Russ*, 2024 WL 3557441, at *2 ("The Trade Agreements Act ('TAA') allows the Government to purchase materials from designated countries notwithstanding the domestic-purchase mandate in the Buy American Act."); *Davinci Co., LLC v. United States*, 178 Fed. Cl. 63, 70 (2025) ("Both the TAA and the BAA, therefore, seek to protect American trading interests along a similar purpose—both protect American manufacturers from unfair international industries."). Veteran Marketing alleges Respironics is engaging in a scheme to sell products manufactured in China to the VA. China is not a designated country with which the United States has a reciprocal trade agreement under the TAA, so acquisitions from there are not exempted from the requirements of the BAA. As a result, selling products manufactured in China to the VA as part of a contract that requires compliance with the TAA is also a violation of the BAA. Mindful not to "hold[ ] plaintiffs to too high a pleading standard before discovery," *Russ*, 2024 WL 3557441, at *3, Plaintiff's BAA allegations will be considered along with all others.

boxes marked "Made in China" to Respironics's distribution facilities in the United States. There, Respironics employees assemble the masks in approximately 10-15 seconds, without the use of tools or machines, repackage them in different boxes without a "Made in China" label, and ship them to the VA. In addition to the masks, blowers used in Respironics's CPAP machines, a central component of the machine, are imported from China and then incorporated with minimal steps into the larger machine in the United States. Lastly, email communications at Respironics discuss the "concerns of packaging ('Made in China' etc.)" and the "sensitivity level that [Respironics] need[s] to be careful with" when providing sample products to the VA.

Respironics argues that Veteran Marketing fails to plausibly allege either the masks or the CPAP Machines were not TAA-compliant. With respect to the masks, Respironics states the Amended Complaint does not plausibly allege they were not manufactured in the United States. With respect to the CPAP Machines, it argues the Amended Complaint does not plausibly allege they were neither manufactured nor substantially transformed in the United States.

Beginning with Defendant's argument regarding the masks, the Amended Complaint "state[s] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Veteran Marketing provides "particular details of a scheme to" falsely certify the masks from China as American-made in compliance with the TAA, including their mode of arrival with "Made in China" labels, their largely pre-assembled nature, the brief process required to assemble them, and the steps taken to re-ship them without a "Made in China" marker. *Foglia*, 754 F.3d at 157-58. This "lead[s] to a strong inference" that the masks are not in fact manufactured in the United States, in violation of the TAA and BAA. *Id.*

Turning then to the CPAP machines, Respironics's argument that Veteran Marketing has failed to allege they are not manufactured in the United States is also unavailing. Respironics

picks apart the Amended Complaint by separately disputing allegations regarding discrete products and contracts[4] in an attempt to demonstrate Plaintiff's inability to meet the pleading standard. Defendant asks too much at this early stage of the proceedings. *See Russ*, 2024 WL 3557441, at *11 ("[A]t this stage the Court does not assess individual allegations sequentially; the complaint is read (and inferences are drawn) holistically."). Veteran Marketing collectively alleges Respironics participated in a scheme to falsely certify compliance with the TAA and BAA when selling a range of respiratory products to the VA, including CPAP machines, under two separate contracts spanning eight years. The "particular detail" regarding CPAP machine blowers, when paired with the "reliable indicia" of two contracts for a variety of respiratory products, including CPAP machines, and emails from Respironics's leadership discussing sampling their products broadly, "lead[s] to a strong inference" that claims for both the masks and the CPAP machines were actually submitted. *Foglia*, 754 F.3d at 157-58. Assessing holistically, in other words, Veteran Marketing has "inject[ed] precision or some measure of substantiation into [the] fraud allegation" concerning the CPAP machines. *Alpizar-Fallas*, 908 F.3d at 919.

Lastly, Respironics's argument that Veteran Marketing fails to allege the CPAP machines were not substantially transformed cannot be decided at this stage, as it improperly requires the Court to resolve a highly fact-intensive, merits-based inquiry. *See United States ex rel. Medina v. Stryker Orthopaedics*, 2022 WL 522788, at *6 (D.N.J. Feb. 22, 2022) ("[T]he Court will not

---

[4] For instance, without citing any legal support for their argument, Respironics argues Plaintiff's claims related to the 2010 Contract should be dismissed because Veteran Marketing fails to adequately allege an express or implied certification of TAA compliance. In alleging a fraudulent scheme, as Veteran Marketing does here, it is not necessary to include details concerning each individual claim. *See Aetna Inc. v. Mednax, Inc.*, 2018 WL 5264310, at *7 (E.D. Pa. Oct. 23, 2018) (Beetlestone, C.J.) ("[A] 'representative sample' was not necessary to state a claim because 'requiring this sort of detail at the pleading stage would be one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.'") (quoting *Foglia*, 754 F.3d at 156).

(and cannot at this stage) make a factual determination [regarding whether a product is an end product under the TAA] based solely on the pleadings and documents integral to the pleadings."). Even if the legal standard for determining whether a product was "substantially transformed" under the TAA is fixed, *see* 19 U.S.C. § 2518(4)(B), 48 C.F.R. § 25.003, "applying it requires an inherently fact-intensive inquiry, assessing the nature, complexity, and effect of the specific manufacturing steps." *AvKare, LLC v. United States*, 182 Fed. Cl. 677, 683 (2026) (citing *TR Int'l Trading Co. v. United States,* 433 F. Supp.3d 1329, 1341 (Ct. Int'l Trade 2020), *aff'd,* 4 F.4th 1363 (Fed. Cir. 2021)).

Veteran Marketing has successfully alleged that claims "submitted to the government as reimbursable," via the two FSS Contracts identified in the Amended Complaint, were not "in fact reimbursable based on the conditions for payment set by the government," given the required verification of BAA and TAA compliance and the import of materials from China. *Care Alts.*, 952 F.3d at 97.

b. Causation

Moving on to causation, Defendant argues the Amended Complaint lacks allegations demonstrating Respironics caused First Nation to submit false claims or create false records that were material to allegedly false claims. Specifically, Respironics asserts an absence of allegations concerning: false statements to and concealments from First Nation about the origins of the CPAP machines and masks; whether First Nation requested any information regarding the origin of the CPAP machines; and, Respironics's involvement in First Nation's submissions. [5]

[5] Defendant argues that Veteran Marketing's allegations that Paul Evans advised the sales team not to send samples directly to the VA with packaging that they were "Made in China," is insufficient because the TAA and BAA apply only to acquisitions under contracts, not samples. *See* 48 C.F.R. § 25.1101. Veteran Marketing also alleges, however, the existence of two contracts with the VA to sell Respironics's respiratory products. The emails regarding sending samples to the VA, as well as the agency's value as Respironics's customer, provide additional "particular details of a scheme to submit false claims." *Foglia*, 754 F.3d at 157-58.

All of this, Respironics argues, indicates that the alleged submission of false claims was not reasonably foreseeable, nor a natural consequence of Respironics's alleged conduct. Veteran Marketing argues that the obvious consequence of Respironics's sale of its products to First Nation was their subsequent distribution to the VA.

"[O]rdinary causation principles from negligence law [apply] in determining responsibility under the FCA." *Zimmer*, 386 F.3d at 344. "Under those principles, the intervention of a force which is a normal consequence of a situation created by the actor's . . . conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about." *Id.* (citing Restatement (Second) of Torts § 443) (quotation marks omitted). *See also United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 416 (3d Cir. 1999) ("It is a basic principle of tort law that once a defendant sets in motion a tort, the defendant is generally liable for the damages ultimately caused, unless there are intervening causes.").

It follows then that under the FCA, it is not required that a defendant directly submit claims to the Government to be liable. *See United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544 (1943) ("[FCA] provisions, considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government."). When an intermediary serves as "merely a conduit" to the submission of a false or fraudulent claim, a direct causal relationship can be inferred between the party who submitted the claim to the intermediary and the party who received the claim from the intermediary. *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 184-85 (3d Cir. 2001). *See also United States v. Bornstein*, 423 U.S. 303, 309 (1976) ("It is settled that the [FCA] . . . gives the United States a cause of action against a subcontractor who causes a prime contractor to submit a false claim to

the Government.”).

To start, Defendant’s arguments that Veteran Marketing fails to allege Respironics either shared false statements with or withheld information from First Nation are inapposite in that the Third Circuit has determined that whether “the party actually presenting the claims to the government was aware of the fraudulent conduct . . . [i]s not a matter material to the Court’s analysis.” *Zimmer*, 386 F.3d at 243. Moreover, even when one party makes “its own decision to file a false certification, this is not inconsistent with a conclusion that [another party] caused that filing.” *Id.* at 244.

Turning to those allegations it does make, Veteran Marketing claims Respironics sells its products to First Nation, which then re-sells those products to the VA. First Nation is simply a distributor, or “conduit,” for manufacturers like Respironics. Under the FSS Contracts, VA facilities purchased from First Nation a massive quantity and variety of products manufactured by Respironics, including CPAP machines and masks. Further, Veteran Marketing alleges that Respironics promotes its products directly to the VA, citing internal documentation describing the VA as the company’s “highest margin account,” as well as correspondence discussing the fact that “margins are higher at the VA . . . and the volumes can be tremendous” and “VA’s [sic] are the beef brisket (vs fast food) of our customers . . . .”

Plaintiff has thus alleged that, in functioning as a distributor for Respironics’s products, First Nation is an intermediary acting as “merely a conduit,” for Respironics’s false or fraudulent claims to the VA. *Hutchins*, 253 F.3d at 184-85 (3d Cir. 2001). Accordingly, “a direct causal relationship can be inferred” between Respironics and the VA. *United States ex rel. Drescher v. Highmark, Inc.*, 305 F. Supp.2d 451, 460 (E.D. Pa. 2004). This inference is further supported by Respironics’s direct contact with and promotion of its products to the VA. The fact that First

Nation holds the FSS Contracts with the agency, and the party certifying compliance with federal law, is the "intervention of a force which is a normal consequence of a situation created by [Respironics's alleged] conduct," and not a "superseding cause of harm." *Zimmer*, 386 F.3d at 244. When construed in a light most favorable to Veteran Marketing, "one can reasonably infer from the foregoing that [Respironics] must have known that [First Nation] could not purchase its [respiratory products] and [re-sell them to the VA] . . . in the manner provided by the contract unless [First Nation] falsely certified itself to be in compliance with federal law." *Id.* As a result, Veteran Marketing has adequately alleged causation.

c. Knowledge

Lastly, Veteran Marketing must plead facts demonstrating Respironics knew that the claims were false. Under the FCA, "knowingly" is defined to "(A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(A)-(B). Although intent to defraud is not required, "an innocent mistake or simple negligence is insufficient." *Stryker*, 2022 WL 522788, at *7 (citing *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.,* 495 F.3d 103, 109 (3d Cir. 2007)). "In legal falsity cases" like this one, "the FCA's scienter element essentially requires deliberate ignorance or reckless disregard of illegality." *United States ex rel. Gohil v. Sanofi U.S. Services Inc.*, 500 F. Supp.3d 345, 360 (E.D. Pa. 2020).

Veteran Marketing alleges Respironics engaged in an intentional effort to conceal the fact that the products they sold to the VA were manufactured in China. In particular, Veteran Marketing alleges that Evans advised the sales team in capital, bold, and underlined text not to send product samples directly to the VA due to "concerns of packaging ('Made in China' etc.)"

and "a sensitivity level that [they] need to be careful with." Further, two weeks later, Scott Mathson, a Government Specialist at Respironics, emailed a reminder, again in capital and underlined text, not to ship samples of the masks directly. Mathson wrote that "[s]hipping directly could raise sensitivity to some of the packaging on the masks (i.e. 'made in china') that we need to remember." He emailed the sales team a few months later to again remind them of the same.[6] Respironics argues the Amended Complaint fails to include any allegation that anyone at Respironics knew the alleged conduct regarding the CPAP machines would violate the TAA and thus cause First Nation to submit false claims to the VA.[7]

First, as noted above, all allegations for an FCA claim are to be evaluated "holistically." *Russ*, 2024 WL 3557441 at *11. This is particularly true when it comes to scienter. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007) ("The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). In a scheme to sell both products under a single contract, Defendant cannot separate allegations related to the CPAP machines from the masks and argue the former fails to demonstrate knowledge while conceding the latter does. Furthermore, under Rule 9(b), "knowledge . . . may be alleged generally," and that standard is met here. Fed. R. Civ. P. 9(b).

---

[6] Additionally, Veteran Marketing alleges Respironics could have obtained a ruling from U.S. Customs and Border Patrol ("CBP") on whether its products have undergone sufficient changes to constitute substantial transformation, *see* 19 C.F.R. § 177.21, and failed to do so. Respironics argues that it is not required to obtain a CBP ruling, and its alleged failure to do so does not support a finding of scienter. Not so. To the degree the lack of a CBP ruling is relevant when considering all allegations holistically, it serves to further support that Respironics may have had "actual knowledge" of the false claim, 31 U.S.C. § 3729(b)(1)(A)(i), avoiding government scrutiny as a result, or, at the very least, were operating under "deliberate ignorance" in deciding not to seek a ruling, *Gohil*, 500 F. Supp.3d at 360.

[7] Respironics does not appear to challenge that Veteran Marketing has sufficiently alleged knowledge with respect to the masks, conceding that point.

Regardless, Respironics's argument ignores Evans's email instructions to the sales team on sending product samples to the VA, which does not specify as to which products were being sent. Even the emails from Mathson concerning only samples of masks speak to a larger potential scheme to state a false claim under the FSS Contracts. At the very least, construed in a light most favorable to Veteran Marketing, these emails collectively create an inference of "reckless disregard of the truth," if not "actual knowledge" of the false information. 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).

***ii. 9(b) Pleading Requirements***

Defendant argues Plaintiff's allegations fail to meet the higher pleading standard under Rule 9(b). As discussed, Rule 9(b) requires a plaintiff allege "the who, what, when, where, and how of the events at issue." *Bookwalter*, 946 F.3d at 176. Again, though, a plaintiff need not "plead anything more, such as the date, time, place, or content of every single allegedly false [ ] claim." *Id.*

Veteran Marketing has met this standard. Beyond allegations regarding Respironics's conduct as a company, Veteran Marketing alleges the particular employees—Paul Evans and Scott Mathson—who instructed their sales team not to send samples directly to the VA based on concern about "Made in China" labeling. That is the who. It alleges Respironics created a scheme to import materials from China, minimally assemble those materials at their U.S. facilities, and then distribute those products to the VA via contracts in which First Nation, their distributor, certified compliance with the BAA and TAA. The what, the how, and the where. This scheme was allegedly conducted under at least two contracts from July 2010 and December 2018 and is supported by emails from January and April 2018. The when. Further, any other allegedly false claims that do not include the "date, place or time," *id.*, offer "particular details of

a scheme to" submit claims falsely certifying compliance with federal law, "paired with reliable indicia that lead to a strong inference that claims were actually submitted," and therefore survive the higher pleading standard. *Foglia*, 754 F.3d at 157-78.

Plaintiff has adequately plausibly alleged that Respironics violated the FCA by providing the VA with masks and CPAP machines it fraudulently claimed were compliant with the TAA and BAA. Defendant's motion to dismiss this claim will be denied.

***iii. Reverse False Claims Under 31 U.S.C. § 3729(a)(1)(G)***

Moving now to Plaintiff's claims under 31 U.S.C. § 3729(a)(1)(G), otherwise known as the "reverse false claim" provision of the False Claims Act. Defendant argues that Veteran Marketing has "impermissibly bootstrap[ped]" reverse false claim liability onto the same allegations it relies on for its other FCA claims. Veteran Marketing acknowledges limitations on pleading reverse false claims by arguing a defendant violated the provision merely by retaining fraudulently obtained payments, but argues it is still entitled to plead this claim in the alternative.

The reverse false claim provision of the FCA imposes liability on any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G). "Whereas §§ 3729(a)(1)(A) and (B) are violated when a person fraudulently requests payment *from* the government, § 3729(a)(1)(G) is violated when a person withholds payment that is owed *to* the government." *Sturgeon v. Pharmerica Corp.*, 438 F. Supp.3d 246, 276 (E.D. Pa. 2020) (emphasis in the original). It "creates liability for knowingly retaining Government overpayments once it is known that there is an obligation to return them, without needing to establish that defendant submitted a false claim . . . ." *United States ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*, 660 F. Supp.3d 381, 406 (E.D. Pa. 2023) (citing

*United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 254 (3d Cir. 2016)). An "obligation" is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3); *see Victaulic*, 839 F.3d at 253.

Courts in this Circuit have generally held that a reverse false claim is redundant of a claim made under sections 3729(a)(1)(A) and (B) is, thus, not permitted. *See, e.g.*, *United States ex rel. Petratos v. Genetech, Inc.*, 141 F. Supp.3d 311, 322 (D.N.J. 2015), *aff'd* 855 F.3d 481 (3d Cir. 2017) ("Claims raised under the FCA's reverse false claims provision may not be redundant of FCA claims asserted under other provisions of [the FCA].") (citations and quotation marks omitted); *Sturgeon*, 438 F. Supp.3d at 280-81 (dismissing Relators' reverse false claim as "merely recast[ing] their §§ 3729(a)(1)(A) and (B) claims."); *United States ex rel. Thomas v. Siemens AG*, 708 F. Supp.2d 505, 514 (E.D. Pa. 2010) ("He is merely recasting his false statement claim . . . . he has not stated a 'reverse false claim' . . . .").

Veteran Marketing has not alleged any discrete obligation Respironics has to pay money to the Government, if it is determined to have sold products in violation of federal law or otherwise, nor any allegations outside of those made in support of claims under the other FCA provisions. It admits as much. Rather, Veteran Marketing argues its reverse false claim survives as an alternative theory of liability at this stage. Should discovery clarify that Respironics did not knowingly submit false claims, Veteran Marketing argues, it could reveal Respironics improperly kept the reimbursements after the payments were made in error. This argument does not alter the fact that the Amended Complaint does not allege an affirmative obligation on the part of Respironics to pay the Government at all, nor that it has knowingly retained any

Government overpayments. The reverse false claim must consequently fail, even considering it independently from and as an alternative to the other FCA claims. *See MacLean v. Wipro Ltd.*, 2022 WL 4550629, at *10 (D.N.J. Sept. 29, 2022) ("While there is no debate that Plaintiffs are entitled to proceed under alternative theories of liability, the allegations must be sufficient to support both theories.") (citation and quotation marks omitted). This claim shall, accordingly, be dismissed.

**B. Article II**

Moving now to Defendant's constitutional challenge, Respironics argues the Amended Complaint should be dismissed because the FCA's *qui tam* provisions violate Article II of the U.S. Constitution. Veteran Marketing argues Respironics has failed to adequately brief these issues, and, in any event, its arguments are without merit. The United States has filed an Opposition to Respironics's Motion to Dismiss regarding only the constitutional challenge under 28 U.S.C. § 2403(a).

To begin with, as the Government noted in its brief, every court of appeals to consider whether the FCA's *qui tam* provisions are consistent with Article II has held that they are. *See United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 190 F.4th 1298, 1303-08 (11th Cir. 2026); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804-07 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753-58 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1040-42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749-59 (9th Cir. 1993); *see also United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 847 (7th Cir. 2020) ("the False Claims Act as a whole is not in imminent danger of unconstitutionally usurping the executive power."); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d

1148, 1155 (2d Cir. 1993) ("[T]he FCA *qui tam* provisions do not usurp the executive branch's litigating function because the statute gives the executive branch substantial control over the litigation.").

District courts within this Circuit have held the same. *See Mayer v. ADCS Clinics, LLC*, 2026 WL 369912, at *2 (E.D. Pa. Feb. 10, 2026); *United States v. Gilead Scis., Inc.*, 2025 WL 2627686, at *7-8 (E.D. Pa. Sept. 11, 2025); *United States ex rel. Penelow v. Janssen Prods., LP*, 2025 WL 937504, at *12 (D.N.J. Mar. 28, 2025); *United States ex rel. Resolution NJ LLC v. Riverside Med. Grp., P.C.*, 2024 WL 4100372, at *5 (D.N.J. Sept. 6, 2024); *Friedman v. Rite Aid Corp.*, 152 F. Supp.2d 766, 770 (E.D. Pa. 2001). The only district court to hold otherwise was recently vacated on appeal. *See United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp.3d 1293 (M.D. Fla. 2024), *vacated and remanded sub nom. Zafirov*, 190 F.4th 1298 (2026).

The Third Circuit, however, has not yet decided the issue. *But see Gilead Scis.*, 2025 WL 2627686, *app. pending* No. 25-2876 (3d Cir.); *Janssen Prods.*, 2025 WL 937504, *app. pending* No. 25-1818 (3d Cir.).

***i. Appointments Clause***

Respironics argues relators function as "officers" under the Appointments Clause, yet they are neither appointed by nor accountable to the President, in violation of Article II. The Appointments Clause grants the President, with the advice and consent of the Senate, the power to appoint "Officers of the United States," and permits Congress to vest the appointment of "inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2. An individual is an officer and thus subject to the Appointments Clause when they "occupy a 'continuing' position established by law" and

exercise "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 237-38 (2018) (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1878)).

To determine whether a position is "continuing," the Court considers "ideas of tenure, duration, emolument, and duties." *Germaine*, 99 U.S. at 511. In this instance, the Court will consider only whether a relator's duties indicate they are an officer under the Appointments Clause.[8] The Eleventh Circuit's recent decision in *United States ex rel. Zafirov v. Florida Medical Associates*, 190 F.4th 1298 (11th Cir. 2026), is particularly useful when conducting that analysis. There, the Court wrote that "Chief Justice Marshall asked 'if [the] duties continue, though the person be changed.'" *Zafirov*, 190 F.4th 1298, 1304 (11th Cir. 2026) (quoting *United States v. Maurice*, 26 F. Cas 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.)); *see also Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890) (relying on *Maurice* in a continuing-position analysis). The United States argues a relator's role is limited in time and scope rather than continuing from officeholder to officeholder over time. It points out that if a particular relator decides to no longer pursue an action, another relator cannot take up that action. Further, should a relator die or declare bankruptcy, representatives of that person's estate or a bankrupt trustee can take up the case, which the Government argues indicates the personal nature of *qui tam* lawsuits. Respironics responds that those instances rather serve as examples of the continuing nature of the

---

[8] The parties argue only whether the "duration" of a *qui tam* action and the "duties" of a relator indicate they are an officer under Article II. Respironics's argument regarding duration is merely that "[r]elators occupy a continuing position [when] they proceed for often extended periods of time in the name of the Government." Without any additional legal authority, this argument is forfeited. *See DLJ Mortg. Cap., Inc.*, 167 F.4th at 635. Even so, Respironics's argument misses the point. As the Eleventh Circuit recently noted, rather than assessing the length of time a *qui tam* action proceeds, the Supreme Court has "evaluated duration the same way it assessed 'tenure'—by asking whether the [individual's] duties were 'permanent' or 'occasional and intermittent.'" *Zafirov*, 190 F.4th at 1305-06 (quoting *Germaine*, 99 U.S. at 511-12). The Supreme Court already determined long ago, and recently affirmed, that a relator is not afforded tenure. *See Auffmordt*, 137 U.S. at 327; *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023) (holding the Government can move to dismiss a relator's suit so long as it intervenes at any point in the litigation). Therefore, the length of time a relator's *qui tam* action proceeds is not duration, as argued by Respironics, and does not suggest that person is an officer. The Court will consequently consider only whether the "duties" of a relator indicate as much.

role. It then offers, as an additional example, the fact that if a relator's complaint is dismissed on procedural grounds, another relator may raise the same claims.

The Eleventh Circuit's response to strikingly similar arguments is again instructive here. In *Zafirov*, the Court wrote that such an argument regarding death or bankruptcy "mischaracterizes what happens when a relator dies or goes bankrupt. In those instances, another relator does not replace the deceased or bankrupt; instead, a personal representative or trustee of the relator's estate can carry forward the case on his behalf." 190 F.4th at 1306. The same has occurred within the Third Circuit. *See United States v. Sun Healthcare Grp., Inc.*, 2024 WL 1640983, at *4 (E.D. Pa. Apr. 16, 2024) (granting leave to amend, in part, to substitute in the estate of a relator after she passed away during the seal period).

Respironics relies on *Kellogg Brown & Root Services, Inc. v. United States ex rel. Carter*, 575 U.S. 650 (2015), for the proposition that a relator is a continuing position because if a relator's complaint is dismissed on procedural grounds, another relator may raise the same claims. The Eleventh Circuit explained why such an argument is flawed. The Court noted the holding in *Carter* was limited to a finding that an FCA action dismissed on procedural grounds is no longer "pending" for the purposes of the statute and therefore does not bar a subsequent, separate FCA action raising the same claims. *Zafirov*, 190 F.4th at 1306 n.7. It was not that one relator can assume the same *qui tam* action for another. *Id.* ("*Carter* does not undermine our conclusion that the role of a relator is personal and not a continuing office.").

Respironics further argues that temporary positions, such as "independent counsel" and "special counsel," have been held to be officers under the Appointments Clause. Defendant relies in part on *United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022), which held that a special prosecutor qualified as an officer under the Appointments Clause. Courts of Appeals have

differed on whether the test in *Donziger* is applicable when determining whether one's duties indicate they occupy a continuing position, however. *Compare Donziger*, 38 F.4th at 296-97 ("[T]hree factors that are helpful to consider in determining whether a temporary position is an office: (1) the position is not personal to a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position are more than incidental."), *with Zafirov*, 190 F.4th at 1304 n. 5 (11th Cir. 2026) ("The Second Circuit's test [in *Donziger*] . . . . is not binding on this Court, and we decline to adopt it; instead, we rely directly on the guidance the Supreme Court has provided.") (citing *Maurice*, 26 F. Cas at 1214). Regardless, one element of the analysis in *Donziger* is whether the "position is not personal to a particular individual." 38 F.4th at 297. As discussed in the context of death and bankruptcy, "[u]nlike a special prosecutor, a relator litigating a *qui tam* action cannot be replaced by another relator. . . ." *Mayer*, 2026 WL 369912, at *3.[9]

Relators do not occupy a continuing position. Accordingly, Veteran Marketing is not an officer of the United States subject to the Appointments Clause of Article II. *See Zafirov*, 190 F.4th at 1304 ("[R]elators do not hold a continuing position, which is sufficient to determine that relators are not officers who must be presidentially appointed."). Defendant's motion to dismiss on this ground is denied.

***ii. Take Care and Vesting Clauses***

Respironics also argues the FCA's *qui tam* provisions permit private parties to exercise core executive power without providing mechanisms for presidential supervision or removal in

---

[9] Defendant also relies on *Morrison v. Olson*, 487 U.S. 654 (1988), to support its argument that a temporary position can still be a continuing position under the law. Multiple Courts of Appeals have distinguished the statute and position at issue in *Morrison* from the *qui tam* provisions of the FCA, and the role of a relator, in holding the *qui tam* provisions do not violate Article II. *See Zafirov*, 190 F.4th at 1306-07; *Riley*, 252 F.3d at 754-56; *Boeing Co.*, 9 F.3d at 750-57. When considered in conjunction with the lack of applicability of the *Donziger* factors, such disparities further support a finding that relators are not officers.

violation of the Vesting and the Take Care Clauses of Article II. The Vesting Clause provides that the "executive Power shall be vested in a President of the United States of America," U.S. Const. art. II, § 1, while the Take Care Clause states that the President shall "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. Because one person cannot "perform all the great business of the State," the Constitution provides for executive officers to assist in the task. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010). Nonetheless, "the Constitution has been understood to empower the President to keep these officers accountable," including "by removing them from office, if necessary." *Id.*

In arguing the constitutionality of the FCA's *qui tam* provisions under both clauses, the United States cites to an extensive history of *qui tam* actions preceding and following the country's founding. The Supreme Court has observed as much. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774-78 (2000) (outlining "the long tradition of *qui tam* actions in England and the American colonies."). The Government relies on this history, in conjunction with other evidence that the FCA's *qui tam* provisions are consistent with the original understanding of Article II, to assert the provisions are compliant with the Take Care and Vesting Clauses. Respironics responds that history is not inherently correlated with constitutionality, but in doing so, relies primarily on language from a Supreme Court dissent. *See Polansky*, 599 U.S. at 450 (Thomas, J., dissenting).

Further, other courts have given credence to the robust history of *qui tam* actions as indicative of the FCA's provisions' constitutionality. *See Stevens*, 529 U.S. at 777 (finding "this history well nigh conclusive" as to whether relators have Article III standing);[10] *Riley*, 252 F.3d

---

[10] Respironics takes issue with the Government's reliance on *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000). It construes the Government's argument as to *Stevens* as standing for the proposition that *qui tam*'s historical roots are "conclusive" of its constitutionality, when *Stevens* only dealt with this

at 753 ("[W]e find that history, although not the sole definitive argument supporting the view that the FCA's qui tam provisions do not violate Article II, is certainly a touchstone illuminating their constitutionality.") (quotation marks omitted); *UCB, Inc.*, 970 F.3d at 847 ("The[ ] ancient pedigree [of *qui tam* actions], however, together with their widespread use at the time of the Founding, suggests that the False Claims Act as a whole is not in imminent danger of unconstitutionally usurping the executive power."); *Mayer*, 2026 WL 369912, at *7 ("The long tradition of *qui tam* statutes, before and immediately after the Founding, supports that Relator's *qui tam* action does not violate Article II."). Such an extensive history, including around the time when the Take Care and Vesting Clauses were written, is relevant, if not dispositive, in discerning whether a conflict exists between the clauses and *qui tam* actions broadly.[11] *See Mayer*, 2026 WL 369912, at *7 ("Though history does not 'justify contemporary violations of

question in the Article III context, and the Court explicitly stated it "express[ed] no view on the question whether *qui tam* suits violate Article II." 529 U.S. at 778 n.8. Respironics mischaracterizes the Government's argument. The United States does cite the Supreme Court's holding that those historical roots are "well nigh conclusive," but notes only in the Article III context. The Government then relies on the holding in *Riley v. St. Luke's Episcopal Hospital* that this history is "conclusive with respect to Article II question" to argue its applicability in this context. 252 F.3d at 752. Moreover, as another court has observed, "[i]t is dubious that this history could be 'conclusive' as a matter of interpreting Article III, but not entitled at the very least to significant weight when interpreting Article II." *Mayer*, 2026 WL 369912, at *6 n.6. Additionally, Respironics argues "[i]ndeed, if the history of *qui tam* statutes were conclusive of their constitutionality for all purposes, there would have been no reason for the *Stevens* Court to have expressly reserved their constitutionality under Article III." This argument fails to acknowledge the Court's additional observation in *Stevens* that "[p]etitioner does not challenge the *qui tam* mechanism under either [the Appointments Clause or the Take Care Clause], nor is the validity of *qui tam* suits under those provisions a jurisdictional issue that we must resolve here." 529 U.S. at 778 n.8. *See also Kawakita v. United States*, 343 U.S. 717, 731 (1952) ("We do not undertake to resolve the question for the reason that it is not squarely presented.").

[11] Respironics points out the ways in which historical *qui tam* statutes differ from the FCA's *qui tam* provisions. First, their analysis relies heavily on *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp.3d 1293 (M.D. Fla. 2024), *vacated and remanded sub nom. Zafirov*, 190 F.4th 1298 (2026). Although the Eleventh Circuit did not address the district court's analysis as to the Take Care and Vesting Clauses, that district court decision remains an outlier. *See United States ex rel. Penelow v. Janssen Prods., LP*, 2025 WL 937504, at *12 (D.N.J. Mar. 28, 2025) ("The Court declines to follow this singular non-precedential and out-of-circuit court decision, and instead follows every federal circuit court of appeals that has addressed this issue. . . ."). Second, in general, "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government," *Marvin v. Trout*, 199 U.S. 212, 225 (1905), which indicates sufficient historical precedence, even if not identical.

constitutional guarantees,' it 'sheds light . . . on what the draft[ers] of [the Constitution] intended [the Constitution] to mean.'") (quoting *Marsh v. Chambers*, 463 U.S. 783, 790 (1983)). Cumulatively, it indicates the absence of conflict between the Take Care and Vesting Clauses and the FCA's *qui tam* provisions.

In addition to these historical roots, the United States also points out that the FCA's *qui tam* provisions enable more governmental control than prior statutes, thereby vesting more power in the executive than has historically been the case. The False Claims Act enables the Executive to intervene at the outset of the case, 31 U.SC. § 3730(b)(2)-(4), and maintain a right to intervene at any point with good cause. 31 U.S.C. § 3730(c)(2)(D)(3). *See Polansky*, 599 U.S. at 423. Even without intervening, the Government maintains significant control over the action. It can move to dismiss an action notwithstanding a relator's objections if the relator has been provided with an opportunity for a hearing, 31 U.S.C. § 3730(c)(2)(A), and the Supreme Court has affirmed the Third Circuit's observation that such dismissals "will satisfy Rule 41 in all but the most exceptional cases." *Polansky*, 599 U.S. at 437 (citing *Polansky v. Exec. Health Res. Inc*, 17 F.4th 376, 390-91 n.18 (3d Cir. 2021)). The Government can also veto a relator's voluntary dismissal, 31 U.S.C. § 3730(b)(1), settle the action if the proposed settlement is fair, adequate, and reasonable under all circumstances, 31 U.S.C. § 3730(c)(2)(B), or stay any discovery that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts." 31 U.S.C. § 3730(c)(4). Although the United States did not intervene in this action, these mechanisms remain available throughout, amounting to considerable power retained by the Government and in alignment with the Vesting and Take Care Clauses.

Lastly, both parties discuss the differences between *qui tam* actions and other statutes that

provide a private right of action. Respironics notes that *qui tam* actions differ in that they are brought "in the name of the Government," and therefore should involve more governmental control. In *Stevens*, though, the Supreme Court rejected the idea that such language means a relator acts as an agent of the Government. 529 U.S. at 772. The Court noted that "[i]t would perhaps suffice to say that the relator here is simply the statutorily designated agent of the United States, *in whose name* (as the statute provides) the suit is brought," but that "this analysis is precluded, however, by the fact that the statute gives the relator himself an interest *in the lawsuit*." *Id.* (emphasis in original) (citations omitted).

The continued involvement and control of the Executive, paired with the historical origins of *qui tam* actions, collectively demonstrate that the FCA's *qui tam* provisions are not violative of the Take Care and Vesting Clauses of Article II. Defendant's motion to dismiss on these grounds is denied.

## IV. CONCLUSION

For the reasons set forth above, Respironics's Motion to Dismiss will be granted in part and denied in part.

An appropriate order follows.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

**WENDY BEETLESTONE, C.J.**